UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 14-cr-00031(1) (JNE/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Samuel David Shoen, | |
| Defendant. | |

Bradley M. Endicott, Assistant United States Attorney, 316 North Robert Street, Suite 404, St. Paul, MN 55101, and Julie E. Allyn, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Ryan M. Pacyga, Pacyga & Associates, P.A., 247 Third Avenue South, Minneapolis, MN 55415 (for Defendant).

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion to Suppress Search and Seizure (ECF No. 35); Motion to Suppress Statements, Admissions, and Answers (ECF No. 36); and Motion to Suppress the Contents of Any Intercepted Wire or Oral Communications and Evidence Derived Therefrom (ECF No. 52). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Joan N. Ericksen, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1(a)(3).

A hearing was held on July 18, 2014. Assistant United States Attorneys Bradley M. Endicott and Julie E. Allyn appeared on behalf of the United States of America (the Government). Attorney Ryan M. Pacyga appeared on behalf of Defendant.

The Court heard testimony from Officer Rigo Aguirre of the St. Paul Police Department ("SPPD"). The Court received the following exhibits: Government Exhibits 1, 2, and 3, photographs of a silver Saturn automobile; Government Exhibit 4, photograph of a ballistic panel; Government Exhibit 5, photograph of a pistol magazine; Government Exhibits 6 and 7, photographs of Smith & Wesson pistol found in the Saturn; and Government Exhibit 8, traffic camera video. At the hearing, the parties also stipulated to the admission of Government Exhibit 9, a squad audio/video recording, which was not available at the time of the hearing. (Tr. 18-19.) Government Exhibit 9 was provided to the Court on July 25, 2014. Post-hearing briefing is now complete and the motions are ripe for a determination by the Court.

## I.

Based upon the file and documents contained therein, along with the testimony presented and exhibits received, the undersigned Magistrate Judge makes the following:

### FINDINGS

Around December 2013, SPPD was investigating Defendant Samuel David Shoen in connection with the sale of a fully automatic Mac-10 style pistol to an undercover officer. (Tr. 9, 10, 33.) As part of the undercover operation, SPPD was also in discussions with Defendant regarding the purchase of live grenades. (Tr. 10.) Additionally, SPPD had information that Defendant was in possession of an AR-15 style

rifle, a pistol, ballistic equipment, and ammunition. (Tr. 10; *see* Tr. 50.) SPPD was also aware of Defendant's felony history, including convictions for terroristic threats and possession of a firearm by an ineligible person. (Tr. 10, 11; *see* Tr. 49.) SPPD received information that, on December 17, 2013, Defendant would be travelling to the Twin Cities and, most likely, a Wal-Mart in Vadnais Heights, Minnesota, to retrieve his vehicle, a silver Saturn. (Tr. 11, 12, 38.) SPPD, including Officer Aguirre, devised a plan in order to arrest Defendant safely. (Tr. 12.)

Officer Aguirre is a nine-year veteran of the SPPD and currently an officer/investigator with the narcotics unit. (Tr. 6.) Officer Aguirre works in conjunction with the Ramsey County Violent Crimes Enforcement Team, where he investigates "narcotics-related crimes and other violent crimes, which could include anything from narcotics to weapons, assaults, and threats." (Tr. 6.) Prior to joining the SPPD, Officer Aguirre worked for the Woodbury Police Department for approximately one year. (Tr. 7.) Officer Aguirre's training includes the St. Paul Police Academy, field training, "the DEA two-week drug school," and a two-week training course put on by the Department of Homeland Security. (Tr. 7; *see* Tr. 54.) Officer Aguirre also participates in ongoing continuing training. (Tr. 54.) Further, Officer Aguirre has served as a training officer and as an instructor at Hennepin Technical College, the St. Paul Police Academy, and "an undercover school." (Tr. 7; *accord* Tr. 54.)

As part of his responsibilities, Officer Aguirre assists in "high-risk" traffic stops, also known as "felony stops and removals." (Tr. 7.) "High-risk" traffic stops involve situations in which law enforcement receives information indicating the traffic stop will

3

be more dangerous or unpredictable than a typical traffic stop and, as a result, law enforcement "use[s] different tactics to make sure that officers are safe, the public is safe[,] and the people involved would be safe." (Tr. 8.) One of the tactics employed in such a situation is the use of multiple officers to approach the vehicle to be stopped. (Tr. 9.)

On December 17, SPPD set up surveillance in the area and eventually located Defendant. (Tr. 12, 39.) Defendant and two other individuals left the Wal-Mart in the Saturn. (Tr. 12, 13, 44, 47.) Law enforcement maintained surveillance of the Saturn from the point it departed the Wal-Mart parking lot until the traffic stop was ultimately effectuated. (Tr. 47.) Defendant was seated in the front passenger seat. (Tr. 13.) The Saturn made its way to Interstate 494, near Woodbury, Minnesota. (Tr. 12, 14, 15.) As the Saturn drove along Interstate 494, other law enforcement vehicles, both marked and unmarked, began entering the highway at various points. (Tr. 41, 45.) Law enforcement followed the Saturn and a traffic stop was subsequently initiated by an officer in a marked squad. (Tr. 14, 45; Ex. 9.) When the Saturn did not pull over in response to the emergency lights, a pursuit-intervention-technique, or PIT, maneuver was used to bring the Saturn to a stop alongside the highway. (Tr. 15, 16, 17, 20, 47-48; Ex. 8; *see* Ex. 9.) By this time, approximately 18 law-enforcement vehicles, both marked and unmarked, were involved in the pursuit of Defendant. (Tr. 14-15, 34.) Shortly after the Saturn was stopped, law enforcement shut down the stretch of Interstate 494 where the Saturn was located. (Tr. 48, 49, 53.)

Once the Saturn came to a stop, Officer Aguirre parked his vehicle, took up "a position of concealment" behind the door of another law-enforcement vehicle, and assisted with the traffic stop. (Tr. 20, 21.) Other law enforcement officers had already taken the driver into custody. (Tr. 21; *see* Tr. 51.) Officer Aguirre assisted with securing the rear passenger and then returned to his position behind the door and proceeded to take Defendant into custody. (Tr. 21, 22, 52, 58, 72.)

In response to law enforcement commands, Defendant placed his hands outside the passenger window. (Tr. 50; Ex. 8.) When directed by law enforcement, Defendant stepped out of the vehicle with his hands up and began walking towards the officers. (Tr. 23, 58-59.) When Defendant was approximately 20 feet in front of Officer Aguirre, Officer Aguirre took over giving instructions to Defendant and subsequently handcuffed him. (Tr. 23, 59.) Officer Aguirre then led Defendant a short distance away and immediately began patting Defendant down. (Tr. 23, 24, 26, 59.)

During his pat-down search, Officer Aguirre discovered that Defendant was wearing ballistic panels from a bulletproof vest tied together with twine. (Tr. 24, 25, 26; *see* Ex. 4.) When Officer Aguirre patted down Defendant's jacket pockets, he felt a heavy object in Defendant's front left pocket. (Tr. 27; *accord* Tr. 77.) Officer Aguirre recognized the object as a magazine, or "clip," with ammunition in it. (Tr. 27.) Officer Aguirre removed the object from Defendant's pocket and confirmed that it was "a pistol magazine, loaded with 40-caliber ammunition." (Tr. 27; *accord* Tr. 31, 76, Ex. 5.)

Based on (1) the information Officer Aguirre had regarding Defendant's weapons-related activities, (2) the discovery of ballistic panels and a loaded magazine on

5

Defendant's person, and (3) Officer Aguirre's safety concerns for himself, Defendant, and the other law enforcement officers involved, Officer Aguirre asked Defendant if he had any other weapons on him. (Tr. 27, 35, 69, 70, 78; *see* Tr. 60, 64.) Defendant told Officer Aguirre that there was a pistol on the floor in the front of the Saturn with a bullet in the chamber. (Tr. 27, 36.) Officer Aguirre then completed the pat-down search of Defendant. (Tr. 78.) Officer Aguirre later testified that, at the time he asked Defendant about any other weapons, Defendant was handcuffed, under arrest, and not free to leave; Officer Aguirre knew that Defendant's possession of any firearms would be evidence of a crime due to Defendant's ineligibility to possess firearms; and Officer Aguirre did not read Defendant a *Miranda* warning prior to inquiring about the presence of other weapons. (Tr. 60, 61; *see* Tr. 64, 68.) Officer Aguirre testified that he was concerned about his safety and Defendant's safety when he asked about other weapons. (Tr. 67, 70, 72.) Officer Aguirre was also concerned about the safety of his fellow officers. (Tr. 72.)

While Officer Aguirre was patting Defendant down, other officers were working to secure the Saturn. (Tr. 28.) At the time Officer Aguirre asked Defendant whether he had any other weapons, the Saturn had not yet been secured. (Tr. 28.) Officer Aguirre alerted the other officers to the pistol in the Saturn. (Tr. 29.) Officer Aguirre then handed Defendant off to a state trooper and returned to the Saturn. (Tr. 29.)

Once Officer Aguirre returned the Saturn, he found a pistol matching the magazine in Defendant's pocket in the front passenger area where Defendant had been seated. (Tr. 29-30, 32; *accord* Tr. 31, Exs. 6, 7.) The pistol was loaded with a round in the chamber, as Defendant said it would be. (Tr. 30.) Additionally, law enforcement

6

found an AR-15 style rifle in the trunk along with over 1,000 rounds of ammunition for the rifle and pistol. (Tr. 31.)

When asked at the hearing why so many law enforcement officers were involved with this particular traffic stop, Officer Aguirre testified:

> This was a situation where we believed a person was in possession of firearms; a person that we've already purchased firearms from; a person that we believed was in possession at some point of, or may still have, live grenades; a person that was just by having these firearms would have been committing a felony, being as he's a felon; and, also, information from the informant, saying that he was unstable, that he had pointed a gun at one of them.

(Tr. 34.) Officer Aguirre also testified that the informant had relayed to the SPPD that Defendant was "going to shoot it out with law enforcement" and essentially "engage law enforcement in a firefight" to avoid being taken into custody. (Tr. 35.) Additionally, Officer Aguirre testified that law enforcement was concerned about weapons and how to remove the three individuals safely from the Saturn. (Tr. 49, 50.)

## II.

Based upon the foregoing Findings, the undersigned makes the following:

### CONCLUSIONS OF LAW

**A. Motion to Suppress Statements, Admissions, and Answers**

Defendant moves to suppress the statement he made in response to Officer Aguirre's question regarding the presence of any weapons. The Government contends that Officer Aguirre's question and Defendant's response fall within the public-safety exception. (Gov't's Resp. to Def's Pretrial Mots. at 8-9, ECF No. 57; Gov't's Post-

7

Hearing Mem. at 5-11, ECF No. 68.) Defendant argues that the exception does not apply based on the calculated manner in which the traffic stop was conducted. (Def.'s Mem. in Supp. of Mot. to Suppress at 12-17, ECF No. 67.)

Defendant begins his legal analysis by arguing that Officer Aguirre's inquiry was a custodial interrogation and therefore a *Miranda* warning was required. (Def.'s Mem. in Supp. of Mot. to Suppress at 8-12.) "Officers must provide *Miranda* warnings to suspects in custody because 'the inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements.'" *United States v. Diaz*, 736 F.3d 1143, 1148 (8th Cir. 2013) (quoting *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401 (2011) (internal quotation marks omitted)). Although the Government asserts that a *Miranda* warning is not required in every circumstance in which a person is questioned by law enforcement, the Government does not appear to assert that a *Miranda* warning was not otherwise required under the circumstances of this case or contest that Officer Aguirre's question was reasonably likely to elicit an incriminating response from Defendant. (*See* Gov't's Post-Hearing Mem. at 5-6.) *See United States v. Crisolis–Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2014) ("Interrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is reasonably likely to elicit an incriminating response from the suspect." (quotation omitted)). Accordingly, the Court turns directly to the applicability of the public-safety exception.

Recently, this Court had the occasion to address the public-safety exception in *United States v. Cesario*:

> "In *New York v. Quarles*, 467 U.S. 649 (1984), the United States Supreme Court established an exception to the *Miranda* advisory requirement when 'police officers ask questions reasonably prompted by a concern for public safety.'" *United States v. Molina–Tepozteco*, No. 07-cr-181 (PJS/SRN), 2007 WL 3023292, at *4 (D. Minn. Oct. 12, 2007) (quoting *Quarles*, 467 U.S. at 656). "In this context, . . . protection of the public safety includes protection of the police officers themselves. The exception does not depend upon the subjective motivation of the questioning officers." *United States v. Liddell*, 517 F.3d 1007, 1009 (8th Cir. 2008) (citation omitted). The Eighth Circuit has "recognized that the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient basis to ask a suspect who has been *arrested* and *secured* whether there are weapons or contraband in a car or apartment that the police are about to search." *Id.* at 1009-10 (emphasis added).

No. 14-cr-0092 (PJS/TNL), 2014 WL 3577436, at *5 (D. Minn. July 18, 2014).

In *United States v. Williams*, the Eighth Circuit applied the public-safety exception to Williams's un-*Mirandized* disclosure of a firearm in response to an officer asking him whether there was "anything we need to be aware of" in the apartment. 181 F.3d 945, 953 (8th Cir. 1999). The officer was aware that Williams had a history of weapons possession and the Eighth Circuit reasoned that "the officers could not have known whether other hazardous weapons were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way." *Id.* at 954 (footnote omitted).

Officer Aguirre testified that, at the time he asked Defendant whether he had any other weapons, he was concerned for his own safety, Defendant's safety, and the safety of the other officers given that Defendant was wearing ballistic panels, had a loaded

9

magazine in his pocket, was recently involved in the sale of a fully automatic Mac-10 style pistol to an undercover officer, and had also discussed selling live grenades to law enforcement. The Court finds Officer Aguirre's testimony credible. The discovery of the improvised bullet-proof vest and loaded magazine gave Officer Aguirre "good reason to be concerned" about the presence of other weapons. *Liddell*, 517 F.3d at 1010 (officers "had good reason to be concerned that additional weapons might pose a threat to their safety" after discovering concealed revolver).

In addition to the immediate indicators of the presence of a firearm, i.e., the loaded magazine and the ballistic vest, as well as Defendant's recent weapons-related activities, Officer Aguirre possessed other information reasonably prompting his concern for public safety. Officer Aguirre was aware that Defendant (1) had a felony history which included terroristic threats and illegal weapons possession; (2) was believed to be in possession of an AR-15 style rifle, a pistol, ballistic equipment, and ammunition; (3) stated that he was "going to shoot it out with law enforcement" rather than being taken into custody; and (4) had pointed a gun at another individual. Taken together, all of this information more than reasonably prompted Office Aguirre's safety concerns for himself, Defendant, and his fellow officers that Defendant was in possession of "hazardous weapons . . . that could cause . . . harm [to himself and law enforcement] if [law enforcement] happened upon them unexpectedly or mishandled them in some way." *Id.*; *see United States v. Noonan*, 745 F.3d 934, 938 (8th Cir. 2014) (defendant's response to pointed question about danger known by officer to be associated with defendant fell under public-safety exception); *United States v. Luker*, 395 F.3d 830, 833-34 (8th Cir.

2005) ("The officers were aware of Luker's history of methamphetamine use and were concerned about needles or substances associated with such use in the car and thus the question concerning the contents of the vehicle was warranted.").

Defendant asserts that "[t]he pivotal axiom [to the public-safety exception] is the *unknown*." (Def.'s Mem. in Supp. of Mot. to Suppress at 13.) Defendant asserts that *Williams*, *Liddell*, and *Luker* all involved "spontaneous situations with unknown firearms, or drug paraphernalia, that could harm the public and/or officers." (*Id.*)  Here, however, Defendant contends that "law enforcement knew [he] likely possessed firearms and took appropriate precautions." (*Id.* at 14.)  Defendant asserts that the traffic stop "was a highly orchestrated, and controlled, event." (*Id.*)  Defendant also asserts that law enforcement knew there were only three occupants in the vehicle. (*Id.*)

Further, Defendant argues that Exhibits 8 (traffic cam video) and 9 (squad audio/video) impeach Officer Aguirre's testimony by showing that Office Aguirre did not immediately pause his pat-down search to ask about the presence of other weapons after he discovered the magazine. (*Id.* at 15.)  Defendant asserts that these exhibits "show that Officer Aguirre did not ask about firearms until the pat down was fully executed. . . [and] two officers actually participated in the pat down." (*Id.*)  Defendant asserts that Officer Aguirre waited over one minute after the discovery of the magazine before asking Defendant whether he had any other weapons. (*Id.*)  Based on these circumstances, Defendant contends that any threat was "eviscerated." (*Id.*)

The Government responds that this traffic stop was deemed to be a "high-risk" stop from the very beginning based on the potential for "a significant number of

11

weapons[,] including both firearms and live grenades," and Defendant's recent weapons-related activities.  (Gov't's Post-Hearing Mem. at 7.)  The Government also states that Defendant's "interpretation [of the public-safety exception] is unsupported by Eighth Circuit precedent and would render the public[-]safety exception inapplicable to many situations when public or officer safety is at risk."  (*Id.* at 8.)  The Government points out that *Luker* and *Williams* involved situations in which law enforcement was aware of the potential for dangerous items based on the defendant's history.  (*Id.*)

Additionally, the Government responds that "there is no evidence that Officer Aguirre finished the pat-down before asking his single question," noting that the video footage in Exhibit 8 "zooms out prior to the completion of the encounter between Officer Aguirre and [Defendant]."  (*Id.* at 9, 9 n.1.)  Even assuming Officer Aguirre had finished the pat-down search at the time he inquired of Defendant, the Government asserts the public-safety exception still applies, citing *Liddell*.  (*Id.* at 9.)  The Government asserts that "the dangerousness of the situation had not passed because officers had yet to clear [Defendant's] vehicle. . . and the threat posed by undiscovered firearms or other weapons remained."  (*Id.* at 9-10.)

While Defendant argues that the preparedness of law enforcement in executing this particular traffic stop eliminated the risks for which the public-safety exception applies, the opposite is true here.  The level of precautions taken by law enforcement demonstrates the overall heightened concerned for safety when interacting with Defendant and further supports the reasonableness of Officer Aguirre's concerns and inquiry.  *See Cesario*, 2014 WL 3577436, at *6 ("[P]olice familiarity with the defendant

and his criminal history and background *support* rather than *defeat* the application of the public-safety exception." (quotation omitted)).

Moreover, to the extent Defendant may have been arrested and handcuffed at the time Officer Aguirre inquired about the presence of other weapons, this fact also does not defeat the purpose and the application of the public-safety exception. Nor do the facts that an additional officer was assisting Officer Aguirre with the pat-down search or that there was approximately a one-minute delay between when Officer Aguirre found the loaded magazine and when he inquired of Defendant. It is not clear to this Court that the pat-down search was complete at the time of the inquiry and the circumstances were such that Officer Aguirre had reasonable concerns for his own safety, Defendant's safety, and the safety of those around them. But, even if the pat-down search had been completed, the public-safety exception still applies. As the Eighth Circuit stated in *Liddell*, "[o]ur prior cases recognized that the risk of police officers being injured by the mishandling of unknown firearms . . . provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search." 517 F.3d at 1009-10. At the time of Officer Aguirre's inquiry, the Saturn had not yet been secured and safety concerns remained.

Finally, Defendant likens this case to *United States v. Rogers*, No. 13-cr-130 (ADM/JJG), 2013 WL 6388457 (D. Minn. Dec. 6, 2013). (Def.'s Mem. in Supp. of Mot. to Suppress at 16-17.) In *Rogers*, law enforcement had information that "Rogers and others were planning to destroy a radio tower in Montevideo, Minnesota, raid the National Guard armory, and attack the Montevideo police station." 2013 WL 6388457,

at *1. Law enforcement also "had information Rogers was a member of a militia or hate group and that he had cheered the Boston Marathon bombings which had occurred three weeks earlier." *Id.* Law enforcement obtained a search warrant to search certain property for, among other things, firearms, ammunition, and explosives. *Id.* Approximately 50 members of law enforcement were involved in executing the search warrant. *Id.* At the same time as the search warrant was being executed, law enforcement located Rogers at his residence and took him into custody for questioning. *Id.*

Just before Rogers was to be interviewed, officers "found two Molotov cocktails, a containerized explosive device wrapped in duct tape, and a containerized explosive device wrapped in cloth. All had fuses attached. They also found eight to ten guns with ammunition." *Id.* When the agent began interviewing Rogers, "bomb technicians were in the process of searching for, examining, and attempting to defuse the devices." *Id.* at 2. Prior to reading Rogers his *Miranda* rights, the agent "questioned Rogers about the location of any other explosives, whether Rogers made the devices and how they were made, the nature and extent of the plot, and whether others might be involved in planning the attack." *Id.* This information was then relayed to the bomb technicians and officers in the field. *Id.* The agent also asked Rogers about firearms found at the property. *Id.*

Rogers moved to suppress the statements and responses he made in response to the agent's questions. *See id.* at *3. The Government asserted that the public-safety exception applied. *See id.* The district court held that, in order

> to ensure the safety of officers at the scene and the surrounding community, [law enforcement] needed immediate information about the nature and quantity of the explosive and incendiary devices, how they were made, how they were intended to be detonated, and whether any other devices, components, or chemicals existed on the property or elsewhere.

*Id.* Further, "[q]uestions related to the alleged plot to strike at various Montevideo locations and to law enforcement's dismantling of potentially dangerous explosive devices were appropriate for public safety reasons." *Id.* Rogers's responses to these questions fell within the public-safety exception. *Id.* at *3-4.

In contrast, the district court held that questions concerning whether Rogers had handled particular firearms found and under what circumstances were not encompassed within the public-safety exception. *Id.* at 4. These questions were not motivated by exigency and safety concerns as the firearms in question had already been secured by law enforcement. *Id.* at *4, 5. "The firearms had been secured and all persons found at the search site had been detained. Rogers was handcuffed and in custody at the police station." *Id.* at *4. Defendant asserts that Officer Aguirre's inquiry is equivalent to the firearms-related questions in *Rogers* because "[t]he scene was absolutely controlled by law enforcement" and "[t]here was no threat posed, or unknown hazard[,] to support the use of the public[-]safety exception." (Def.'s Mem. in Supp. of Mot. to Suppress at 17.)

As the district court observed in *Rogers*, "[i]n firearms cases where the public safety exception has been applied, including *Quarles*, the officers conducting the arrest asked questions that would protect them and the public from immediate dangers or from a weapon in the area of the arrest." 2013 WL 6388457, at *5. This is precisely what

15

occurred here. Officer Aguirre asked Defendant whether he had any weapons in the immediate vicinity. As Defendant himself recognizes, "law enforcement knew [he] *likely* possessed firearms." (Def.'s Mem. in Supp. of Mot. to Suppress at 14 (emphasis added).) And, as the Government points out, Officer Aguirre asked a single question tailored to "identifying weapons that needed to be properly handled for safety purposes." (Gov't's Post-Hearing Mem. at 10, 11.) Contrary to Defendant's assertion, *Rogers* supports that application of the public-safety exception under the circumstances of this case.

Based on the foregoing, the Court finds that Officer Aguirre had an objective, reasonable concern for public safety when he asked Defendant whether he had any other weapons on him. Accordingly, the Court recommends that Defendant's motion to suppress the statements he made in response to that inquiry be denied.

### B. Motion to Suppress Search and Seizure & Motion to Suppress Contents of Any Intercepted Wire or Oral Communications and Evidence Derived Therefrom

Defendant brought two additional motions to suppress: a motion suppress evidence obtained via search warrant from his Facebook and Gmail accounts and a motion to suppress intercepted wire and oral communications. At the hearing, the parties confirmed that evidence was only being presented on the previously discussed motion to suppress statements, admissions, and answers. (Tr. 3-4.) No evidence was presented on either the search-and-seizure motion or the intercepted-communications motion. Additionally, no post-hearing briefing was submitted on either of these motions.

With respect to Defendant's request that evidence obtained from his Facebook and Gmail accounts be suppressed, the Government responds that it does not intended to

introduce any evidence derived from the search warrants relating to these accounts. (Gov't's Resp. to Def.'s Pretrial Mots. ¶ 9.) Therefore, the Court recommends that this motion be denied as moot.

Similarly, with respect to Defendant's generic request to suppress intercepted communications, the Government responds that the Government "is not currently aware of any use of investigatory surveillance by wiretapping, radio transmission receptions, or intercepted telephone conversations (except for consensual jail audio and video calls, and other recorded calls which have been or will be disclosed)." (Gov't's Resp. to Def.'s Pretrial Mots. ¶ 13.) Therefore, the Court recommends that this motion be denied as moot as well.

[Continued on next page.]

## III.

Based upon the foregoing Findings and Conclusions, the undersigned Magistrate Judge makes the following:

## RECOMMENDATION

For the reasons set forth herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Statements, Admissions, and Answers (ECF No. 36) be **DENIED**.

2. Defendant's Motion to Suppress Search and Seizure (ECF No. 35) be **DENIED AS MOOT**.

3. Defendant's Motion to Suppress the Contents of Any Intercepted Wire or Oral Communications and Evidence Derived Therefrom (ECF No. 52) be **DENIED AS MOOT**.

Date: September   8   , 2014                                     *s/ Tony N. Leung*
                                                                 Tony N. Leung
                                                                 United States Magistrate Judge
                                                                 for the District of Minnesota

                                                                 *United States v. Shoen*
                                                                 File No. 14-cr-00031(1) (JNE/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **September 23, 2014**.